AO 106 (Rev. 04/10) Application for a Search Warrant

# UNITED STATES DISTRICT COURT

for the

Middle District of Alabama

| | | |
|---|---|---|
| In the Matter of the Search of | ) | |
| *(Briefly describe the property to be searched or identify the person by name and address)* | ) ) | Case No. 2:17mj177-GMB |
| A WHITE TESLA SEDAN FURTHER DESCRIBED IN ATTACHMENT A | ) ) | |

## APPLICATION FOR A SEARCH WARRANT

I, a federal law enforcement officer or an attorney for the government, request a search warrant and state under penalty of perjury that I have reason to believe that on the following person or property *(identify the person or describe the property to be searched and give its location)*:
a white Tesla sedan further described in Attachment A

located in the _____ **Middle** _____ District of _____ **Alabama** _____ , there is now concealed *(identify the person or describe the property to be seized)*:
See Attachment B

The basis for the search under Fed. R. Crim. P. 41(c) is *(check one or more)*:

☑ evidence of a crime;

☑ contraband, fruits of crime, or other items illegally possessed;

☑ property designed for use, intended for use, or used in committing a crime;

☐ a person to be arrested or a person who is unlawfully restrained.

The search is related to a violation of:

| *Code Section* | *Offense Description* |
|---|---|
| 21 USC 841(a)(1) | Controlled Substances Act |
| 18 USC 1956, 1957 | Money laundering |
| 18 USC 1347 | Healthcare fraud |

The application is based on these facts:
See attached affidavit (ATTACHMENT 1) incorporated herein by reference and made part of this application.

☑ Continued on the attached sheet.

☐ Delayed notice of _____ days (give exact ending date if more than 30 days: _____ ) is requested under 18 U.S.C. § 3103a, the basis of which is set forth on the attached sheet.

_____
*Applicant's signature*

Special Agent Darryl Henton, Drug Enforcement Admin.
*Printed name and title*

Sworn to before me and signed in my presence.

Date: **August 1, 2017**

_____
*Judge's signature*

City and state:   MONTGOMERY, AL

GRAY M. BORDEN, U.S. MAGISTRATE JUDGE
*Printed name and title*

## AFFIDAVIT IN SUPPORT OF APPLICATION FOR SEARCH AND SEIZURE WARRANT

### I. INTRODUCTION

**A.     Agent Training and Experience**

Your affiant, Darryl W. Henton, is an investigator or law enforcement officer of the United States within the meaning of Title 18, United States Code, Section 2510, that is, an officer of the United States who is empowered by law to conduct investigations and to make arrests for offenses enumerated in Title 18, United States Code, Section 2516. Your affiant has been a special agent of the Drug Enforcement Administration (DEA) since November of 1997. Prior to becoming a special agent, your affiant was a state of Alabama, City of Mobile, Alabama police officer from November of 1985 to November of 1997. Your affiant also attained a bachelor of science degree in criminal justice and a master's degree in public administration from Troy State University in Troy, Alabama.

Pursuant to my employment with the DEA, I have investigated criminal violations of federal drug laws and related offenses, including, but not limited to, violations of Title 21, United States Code Sections, 841, 843, 846, 848, 856, 952, 960, and 963, and Title 18, United States Code, Sections 1952 and 1956. Your affiant is familiar with, and has employed, all normal methods of investigation, including, but not limited to, visual surveillance, electronic surveillance, informant interviews, interrogation, and undercover operations.

In connection with drug trafficking investigations, your affiant has participated in and/or executed numerous search warrants, including residences of drug traffickers/manufacturers and their co-conspirators/associates, stash houses used as storage and distribution points for

controlled substances, and business offices used by drug dealers as "fronts" to conceal their unlawful drug trafficking activities and the proceeds obtained from unlawful drug trafficking.

Your affiant has participated in investigations involving the following types of drugs: oxycodone, hydrocodone, hydromorphone, cocaine, cocaine base, marijuana, and other controlled substances. Your affiant has also interviewed numerous witnesses to, and participants in, drug trafficking organizations that illegally distribute prescription drugs who have described to me the techniques that they and other organization members used to distribute and dispense controlled substances as well as to transport, conceal, or launder the illegal drug proceeds.

As part of my training and experience, your affiant is aware that certain controlled substances are often abused and illegally diverted from what would otherwise be considered legitimate medical uses. In particular, opiate-based narcotics that are intended to legitimately treat chronic to moderately severe pain are often diverted and abused for the euphoric effect they produce, an effect similar to that associated with heroin use. Your affiant also knows that individuals who abuse these types of drugs are at risk for becoming physically dependent on the drugs.

Your affiant has investigated and assisted with the investigation of individuals and organizations that illegally disburse or dispense controlled substances under the guise of operating seemingly legitimate medical clinics (colloquially known as "pill mills"). These pill mills generally operate as pain management clinics, emergency care or "urgent care" clinics, or other similarly characterized clinics. Typically, an individual who seeks to abuse or illegally divert controlled substances will attend one of these medical clinics. The physician at the medical clinic issues a prescription for a controlled substance, often without performing the minimal professionally required medical assessment of the patient's complaints, or properly

2

evaluating whether disbursing the controlled substances is medically appropriate. As a result, these clinics attract large numbers of individuals who often travel long distances seeking prescriptions from these physicians. Additionally, it is not unusual in these investigations for the owners, staff, and physicians at the medical clinics to dispense the controlled substances themselves, or to refer patients to particular pharmacies that are known to fill the illegitimate prescriptions for controlled substances.

**B.     Premises**

I make this affidavit in support of an application for the issuance of a warrant to search the commercial property described as the medical offices of Dr. Gilberto Sanchez, M.D., also known as the offices of Gilberto Sanchez M.D., Inc., located at 4143 Atlanta Highway, Montgomery, Alabama 36109 (further described in Attachment A), including all buildings, structures, storage facilities, and other artifices located at that address, in order to seize fruits, instrumentalities, and evidence related to possible violations of: (1) Title 21, United States Code, Section 841(a)(1); (2) Title 18, United States Code, Sections 1956 and 1957; and (3) Title 18, United States Code, Section 1347. There is probable cause to believe that fruits, instrumentalities, and evidence of these crimes (further described in Attachment B) will be found in a search of the premises.

**C.     Background and Definitions**

Based on my training and experience, and the training and experience of other DEA diversion investigators, special agents, and other law enforcement officers, I know that:

1.  Title 21, United States Code, Section 841(a)(1) makes it unlawful for any person knowingly or intentionally to distribute or dispense a controlled substance except as authorized by that subchapter.

3

2. Under Title 21, United States Code, Sections 822(a)(1) and (a)(2), and 21 C.F.R. § 1301.11 and other regulations, a person who distributes or dispenses any controlled substance, or who proposes to dispense any controlled substance, must obtain a registration from the DEA every three years.

3. Under 21 C.F.R. § 1306.03, a prescription for a controlled substance may only be issued by a practitioner who is both authorized to prescribe in the jurisdiction in which she is licensed to practice her profession and registered with the DEA (unless otherwise exempt from registration).

4. Under 21 C.F.R 1306.3(a)(1) and (2) and 21 C.F.R. § 1306.4(a), a prescription for a controlled substance is only valid if it has been issued for a legitimate medical purpose by an individual practitioner acting in the usual course of professional practice.

5. By law, under 21 C.F.R. § 1306.04(a), the responsibility for the proper prescribing and dispensing of controlled substances is upon the prescribing practitioner, but a corresponding liability rests upon the pharmacist who fills a prescription.

6. Pursuant to 21 U.S.C. § 881(a)(6), all moneys and things of value that were furnished or intended to be furnished in exchange for a controlled substance, that constitute proceeds traceable to such an exchange, or that were used or intended to be used to facilitate the sale or exchange of a controlled substance in violation of 21 U.S.C. § 841 are subject to seizure and forfeiture to the United States.

7. Pursuant to 21 U.S.C. § 881(a)(4), all vehicles that are used, or are intended for use, to transport, or in any manner facilitate the transportation, sale, receipt, possession or concealment of a controlled substance in violation of 21 U.S.C. § 841 are subject to seizure and forfeiture to the United States.

4

8. Pursuant to 18 U.S.C. § 981(a)(1)(A), any property, real or personal, involved in or traceable to a transaction or attempted transaction in violation of 18 U.S.C. § 1957 is subject to forfeiture to the United States.

9. Pursuant to 18 U.S.C. § 1957, it is a crime to engage or attempt to engage in a monetary transaction involving criminally derived property having a value greater than $10,000, knowing that the property was derived from unlawful activity.

10. Pursuant to 18 U.S.C. § 1956, it is a crime to engage or attempt to engage in a monetary transaction involving criminally derived property: (1) with the intent to promote the carrying on of a specified unlawful activity; (2) with the intent to engage in a specified violation of the Internal Revenue Code; (3) with the intent of concealing the source, location, ownership, nature, or control of the proceeds of the specified unlawful activity; or (4) to avoid a state or federal reporting requirement.

11. Pursuant to 18 U.S.C. § 1347, it is a crime to defraud a health care benefit program or to obtain, by means of false or fraudulent pretenses, representations, or promises, the money or property owned by, or under the custody or control of, any health care benefit program.

12. By law, under 21 C.F.R. § 1304.04, inventories and records of controlled substances listed in Schedule II shall be maintained separately from all other records maintained by the registrant. Likewise, inventories and records of controlled substances in Schedules III, IV, and V must be maintained separately or in such a form that they are readily retrievable from the ordinary business records of the practitioner. All records related to controlled substances must be maintained and be available for inspection for a minimum of two years.

13. The Alabama Board of Medical Examiners requests that a physician maintain a patient's complete treatment records (including evaluations, diagnoses, and prognoses) for a period of no less than ten years from the patient's last visit.

14. Other than medical records, it is standard practice for documents to be kept by medical offices in the normal course of business reflecting daily billing, accounts received, bank records, deposit receipts, telephone records, appointment books and sign in sheets. These financial records and billing documents often contain evidence to establish that patients have consulted with the doctor or have received prescriptions from the doctor. Further, prescription pads are normally kept in offices, exam rooms and laboratories of medical practices that prescribe controlled substances.

15. Computers are used in medical offices to record patient information, medical records, prescription logs, appointments, billing and payment records, work schedules and other information needed to operate a medical practice.

16. By law, under 21 C.F.R. § 1304.33, DEA registrants must submit information about all transactions in which a Schedule II or Schedule III-N (narcotic) controlled substance is acquired or distributed (i.e., from a supplier to a pharmacy). The information is transmitted to DEA's Automation of Reports and Consolidated Ordering System (ARCOS) Unit on a quarterly basis and maintained in a DEA database.

17. Based upon my training and experience, I know that Schedule II, III, and IV substances are sold in varying strengths and under various brand names.

18. Based upon my training and experience, I know that the following types of Schedule II, III, and IV controlled substances are often subject to abuse:

6

a. OxyContin and Roxicodone are brand names of oxycodone, an opioid narcotic analgesic that is a Schedule II controlled substance;

b. Methadone is an opiate narcotic analgesic that is a Schedule II controlled substance; I know that methadone is highly addictive and can be lethal when taken in large dosages and in combination with other drugs; I also know that methadone is frequently sought by those who are addicted to opioids;

c. Percocet is the brand name of oxycodone combined with acetaminophen (APAP), an opioid narcotic analgesic that is a Schedule II controlled substance;

d. Dilaudid is the brand name of hydromorphone, an opioid narcotic analgesic that is a Schedule II controlled substance;

e. Opana is the brand name of oxymorphone, an opioid narcotic analgesic that is a Schedule II controlled substance;

f. Lorcet/Lortab is the brand name of hydrocodone with acetaminophen, an opioid narcotic analgesic and Schedule II-N controlled substance;

g. Xanax is the brand name of alprazolam, a benzodiazepine used to treat anxiety and panic disorders and a Schedule IV controlled substance;

h. Soma is the brand name of carisoprodol, a muscle relaxer and a Schedule IV controlled substance;

19. Under 21 C.F.R. § 1306.05, prescriptions for Schedule II, III, and IV controlled substances are required to be dated as of, and signed on, the day when issued and shall bear the full name and address of the patient, the drug name, strength, dosage form (e.g., "2mg" or "80mg"), quantity prescribed (e.g., "#120" or 120 tablets), directions for use, and the name, address and registration number of the practitioner.

7

20. Based on my training and experience, indications that physicians are issuing prescriptions for controlled substances outside the course of professional practice and without a legitimate medical purpose include, but are not limited to, the following:

    a.  The medical clinic accepts only cash and does not accept insurance;

    b.  Patients travel long distances (from out-of-county or out-of-state);

    c.  Patients line up for appointments hours in advance;

    d.  Appointments are not for a specific time;

    e.  Patients travel in groups;

    f.  High volume of patients going through the clinic;

    g.  Cursory physical examination, or no physical examination, during initial and follow-up visits;

    h.  Brief initial and follow-up visits;

    i.  Doctor does not undertake an independent evaluation of patient (i.e., patient suggests or directs the medication to be prescribed);

    j.  Doctor writes out prescriptions for controlled substances and places them in the patient's file prior to the patient's visit;

    k.  Failing to treat patients with anything other than controlled substances;

    l.  Failing to heed warnings by others that drug-seeking persons are trying to obtain controlled substances from the doctor;

    m. Patients who appear and behave in a manner consistent with abusing, or being addicted to, controlled substances;

    n.  Patients engage in drug deals on clinic property or openly discuss diverting their prescriptions;

o. Directing patients to particular pharmacies to fill their prescriptions;

p. Pharmacies have stopped filling the physician's prescriptions due to suspicious activity or high number of controlled substance prescriptions; and,

q. Clinic owners/operators and employees are particularly aware of law enforcement or potential investigations.

21. Based on my training and experience, reasons that a pharmacist would not dispense a controlled substance prescribed by a specific doctor include, but are not limited to, the following:

a. A pharmacy receives an unusually high volume of prescriptions for controlled substances from the same physician;

b. Pharmacist is aware that patients travel long distances to see a particular physician (who is not a highly sought-after specialist); and,

c. Other pharmacies have stopped filling a particular physician's prescriptions due to suspicious activity or high number of controlled substance prescriptions.

22. Based on my training and experience, your affiant also knows that:

a. Pill mill clinic operators and other traffickers in prescription drugs often place assets in names other than their own to avoid detection by the government and possible forfeiture of these assets by government and law enforcement agencies;

b. Pill mill clinic operators and other traffickers in prescription drugs often place assets in names of business/corporate entities as nominee title holders in order to avoid detection of these assets by government and law enforcement agencies. Even though these assets are placed in the names of other persons or entities, the

9

pill mill clinic operators actually own and continue to use these assets and exercise dominion and control over them; and,

c. Pill mill clinic operators will accumulate and maintain substantial amounts of proceeds, specifically currency, over a period of years, so that the proceeds can be used in later years for personal asset acquisitions and/or expenditures during periods when the clinic owner is not distributing drugs.

23. Based on my training and experience, your affiant knows that people involved in fraudulent schemes often maintain records of their crimes, both in hard copy and electronic format, even after the crime has been discovered.

24. Based upon my training and experience, your affiant knows that people involved in fraudulent schemes or illegal activities where cash money is obtained often keep these monies in their homes, businesses, or safety deposit boxes.

25. Based upon my training, work experience, and life experience, your affiant knows that people maintain personal financial records for long periods of time, including checking and savings account records, income tax returns, and safety deposit boxes, in their home either in traditional hard copy form or on an electronic device.

26. Based upon my training and work experience, your affiant knows that people involved in criminal activity that deals predominantly in cash, such as described throughout this affidavit, will remove, or "skim" portions of the illegal proceeds and hide this cash in their homes, businesses, safety deposit boxes, vehicles, or secret compartments in those locations.

27. Based upon my knowledge, training, and experience and consultation with other DEA personnel who have expertise in information technology, your affiant knows that

10

searching and seizing information from computers often requires agents to seize most or all electronic storage devices (along with related peripherals) to be searched later by a qualified computer examiner in a laboratory or other controlled environment. This is true because of the following:

    a.   The volume of evidence: computer storage devices (like hard disks, diskettes, tapes, laser disks, optical disk, CD-ROMs and PC Cards) can store the equivalent of thousands of pages of information.

    b.   If a suspect tries to conceal evidence of criminal activity; he or she might store that evidence in random order with deceptive file names, encrypt the data, or otherwise attempt to "hide" or "mask" the relevant data. This may require searching authorities to examine all the stored data to determine which particular files are "evidence or instrumentalities of a crime." This sorting process can take weeks or months, depending on the volume of data stored, and the method in which it is stored, and it would be impractical to attempt this kind of search on site.

    c.   Additionally, if a suspect has attempted to delete, or remove from storage, evidence of criminal activity from computer storage devices, that evidence may still reside on the computer in the form of "residue." Residue in this context is defined as the information present in unused file data. Residue may consist of the files which have been erased, or file slack. When a file is erased, the data from the file is not necessarily deleted. The file may remain on the disk until it is overwritten by other data. File slack can be defined as the space in the data area of a disk between the end of a file and the end of the last cluster allocated to the

file. Data found in "slack space" may have come from data in Random Access Memory at the time the file was created or updated, or it may come from a file which previously had occupied the space. It is possible to retrieve data from residue area which may be of evidentiary value. Data found in residue areas may reside on the storage device long after the original file has been erased or removed. The residue data will remain on the storage device until such time that the residue is overwritten, if ever. Searching the residue areas of computer storage devices can prove to be time consuming and require analytical methods and techniques which are best performed in a laboratory or other controlled environment.

28. Further, based upon my knowledge, training, and experience and consultation with other DEA personnel who have expertise in information technology, your affiant knows that searching computerized information for evidence and instrumentalities of crime commonly requires agents to seize most or all of a computer system's input/output (I/O) peripheral devices, related software, documentation, and data security devices, including passwords, so that a qualified computer examiner can accurately retrieve the system's data in a laboratory or other controlled environment. This is true because peripheral devices that allow users to enter or retrieve data from the storage devices vary widely in their compatibility with other hardware and software. Many systems storage devices require particular In/Out devices in order to read the data on the system. It is important that the analyst be able to properly re-configure the system as it now operates in order to accurately retrieve the evidence listed above. In addition, the analyst needs the relevant system software (operating systems, interfaces, and hardware drivers) and any

12

applications software which may have been used to create the data, as well as all related instruction manuals or other documentation and data security devices.

If after inspecting the In/Out devices, software, documentation, passwords, and data security devices, and methods in which the data has been stored, the analyst determines that these items are no longer necessary to retrieve and preserve the data evidence, they will return these items within a reasonable time.

The government does wish to seize the electronic storage devices, described above, in order to properly search the contents of those devices. Every effort will be made to obtain the information contained in the electronic storage devices, described above, at the time of the search. Items will be seized only if computer experts participating in the search determine that necessary data cannot be obtained during the service of the warrant due to any of the aforementioned constraints.

## II. INVESTIGATION OF SANCHEZ

### A.    Sanchez's Previous Disciplinary History

Based upon my investigation, I am aware that Sanchez is a general practice physician practicing at 4143 Atlanta Highway in Montgomery, Alabama. I know that Sanchez has been practicing at this location, intermittently, since at least 2006. I also know that Sanchez is the incorporator and registered agent of Gilberto Sanchez M.D., Inc., a business entity registered as a medical practice with the state of Alabama and having a reporting address of 4143 Atlanta Highway in Montgomery, Alabama.

I am aware that Sanchez has previously been the subject of disciplinary proceedings brought against him by the Alabama Board of Medical Examiners (ABME) and based upon

13

Sanchez's prescribing of controlled substances. The details of those proceedings are, based upon information provided to me by the ABME, set forth below.

Sometime around the middle of the previous decade, Sanchez began to specialize in weight loss treatment. As part of this specialization, he opened six diet clinics, with one clinic located in each of the following Alabama towns: Montgomery, Troy, Ozark, Prattville, Auburn, Andalusia, and Dothan. Sanchez did not obtain additional licenses from the DEA to prescribe controlled substances at any of these non-Montgomery locations.

Soon after opening these clinics, the ABME received reports that, at these weight loss clinics, Sanchez and those working for him were inappropriately prescribing and dispensing controlled substances. Accordingly, the ABME began an investigation. As part of that investigation, in May and June of 2006, the ABME sent undercover investigators posing as new patients into Sanchez's clinics. At the clinics, Sanchez's employees (none of whom were doctors) administered or dispensed to the investigators a number of amphetamine-based controlled substances. The employees did so without conducting any type of physical examination. They also failed to label the controlled substances. One employee even injected drugs into patients without being supervised by any trained health care professional. Most glaring, physicians were not present on all occasions when the employees dispensed these drugs.

To facilitate the employees' dispensing the drugs, Sanchez left at each clinic signed, but otherwise blank, prescription forms. As they dispensed medication, the employees completed the forms by adding the following information: (1) the patient's name; (2) the type of drug dispensed; and (3) the quantity dispensed.

14

Also troubling was the way that Sanchez arranged for the drugs to make their way to the clinics. Sanchez hired employees who did not have DEA registrations to transport the drugs from a wholesale pharmacy in Montgomery to the various clinics.

In June of 2006, Sanchez contacted the ABME and requested information about proper prescribing practices for amphetamines. The ABME promptly provided that information. Nonetheless, Sanchez did not alter the way the weight loss clinics operated.

In July of 2006, the ABME confronted Sanchez about its investigation. Sanchez admitted to the ABME that he had failed to comply with state and federal laws associated with the prescribing and dispensing of controlled substances. However, Sanchez attributed his violations to his failure to fully comprehend the governing rules.

In the course of its investigation of the weight loss clinics, the ABME also discovered that Sanchez was unlawfully prescribing another controlled substance—Marinol. Marinol is the brand-name version of the drug dronabinol. It contains tetrahydrocannabinol (THC) and is often prescribed to treat nausea or vomiting caused by cancer medications and to stimulate the appetites of individual suffering from Autoimmune Deficiency Syndrome (AIDS). It is a Schedule III controlled substance.

The ABME investigation revealed that Sanchez was supposedly prescribing Marinol to treat chronic pain. Sanchez's doing so constituted an off-label use of the drug. Sanchez tried to support his prescribing of Marinol by providing research articles that purportedly endorsed the use of Marinol to combat pain. However, the board rejected those articles as not being based upon scientific studies.

The ABME investigators suspected that, contrary to Sanchez's claims of prescribing Marinol to treat pain, he was actually prescribing it to facilitate recreational drug use. The

15

ingestion of Marinol will cause an individual to test positive for THC. Importantly, the use of marijuana will cause the same result. Thus, as the ABME found, a prescription for Marinol is essentially a "get out of jail free card" for the use of marijuana. The ABME discovered at least one instance of one of Sanchez's patients obtaining a prescription for Marinol on the same day that the patient took a workplace drug test. The ABME also interviewed a patient who claimed that he received a prescription from Sanchez for Marinol after telling Sanchez that he was a frequent marijuana user.

In light of Sanchez's state regulatory violations associated with the weight loss clinics and the Marinol prescriptions, in 2009, the ABME sanctioned him. It did so by placing him on indefinite probation and fining him $70,000.00. One of the terms of Sanchez's probation was that Sanchez had to limit his practice to only one location. He was also precluded from dispensing medication and from working at a practice wherein some other physician dispensed medication.

In February of 2010, the ABME determined that Sanchez had violated one of the terms of his probation. Namely, Sanchez had practiced at an addiction treatment clinic in Montgomery and at his Montgomery practice. Because he was practicing at more than one place, in violation of his probation, the ABME imposed a six-month suspension of Sanchez's medical license.

Sanchez served that six-month suspension and then continued with his probation. On April 27, 2012, the ABME lifted the probation and terminated the restrictions upon Sanchez's license.

**B.    Recent Reports to the ABME of Dr. Sanchez Operating a Pill Mill**

16

In 2016, regulatory and law enforcement agencies received a series of reports suggesting that Sanchez was operating a pill mill through his medical practice, located at 4143 Atlanta Highway in Montgomery.

The first report came on March 28, 2016. On that date, F.B. contacted the ABME regarding Sanchez. F.B. said that her daughter, S.B. was a current patient of Sanchez's. S.B. received controlled substance prescriptions from Sanchez. According to F.B., S.B. weighed only 93 pounds and was in very poor health. Thus, in February of 2016, F.B. contacted Sanchez's office and asked that Sanchez not prescribe such medications to S.B. Sanchez ignored this request and continued to prescribe controlled substances to S.B., according to F.B. The ABME later informed the DEA of F.B.'s report.

Based upon F.B.'s information, the ABME opened an investigation. Soon thereafter, an anonymous letter came to the ABME. That letter pertained to Sanchez. According to the letter, dated April 4, 2016, Sanchez was: (1) prescribing controlled substances unnecessarily and for no legitimate medical purpose; (2) fraudulently billing public and private insurance providers for office visits by claiming that an office visit lasted at least 20 minutes when in fact the visit lasted only 4 minutes; (3) providing controlled substance prescriptions without seeing patients; and (4) operating a car dealership through which he was fraudulently selling cars to employees. The ABME subsequently sent a copy of the letter to the DEA.

As part of its investigation, on May 11, 2016, the ABME served an administrative subpoena upon Sanchez's office. The subpoena requested that Sanchez produce medical records associated with approximately 17 named patients. Among the named patients was S.B. The ABME used its own criteria to select the other 16 patients whose charts it asked Sanchez to produce. Sanchez produced the requested records to the ABME on June 24, 2016.

17

**C.     Report to Crime Stoppers Organization**

Subsequently, the Central Alabama Crime Stoppers received an anonymous tip regarding Sanchez.  That report stated that Sanchez and a licensed professional counselor employed by him, Johnnie Sanders, were jointly operating a pill mill.  The tipster alleged that Sanchez was prescribing controlled substances unnecessarily and that Sanders was brokering pill swaps among Sanchez's patients.  For example, the tipster said, "A friend was recently approached by Ms. Sanders to sell some Xanex to one of her clients who had run out of her prescription too soon."  The Crime Stoppers organization sent this report to the DEA.  Upon receipt of the report, the DEA began an investigation of Sanchez and those working for him.

**D.     Pharmacists' Concerns**

Even before receiving information about Sanchez, in June of 2016, a DEA diversion investigator working with me contacted various pharmacists located in and around Montgomery. The diversion investigator contacted the pharmacists as part of an unrelated investigation and asked the pharmacists whether the pharmacists had concerns about the controlled substances prescribing practices of any area physicians.  Three pharmacists immediately stated that they were concerned about prescriptions written by Sanchez.  The details of such statements are as follows:

- Pharmacist Carl Bledsoe of Adams Drugs located in Wetumpka, Alabama stated that he knew that patients lined up outside of Sanchez's office to get an appointment with him.

- Pharmacist Tim Guerin of Fountain City Pharmacy located in Prattville, Alabama told the diversion investigator that he was suspicious of Sanchez's prescriptions because Sanchez wrote a high number of such prescriptions.

18

- Pharmacist Cedric Kousk of CVS Pharmacy located on Cobbs Ford Road in Prattville said that Sanchez wrote a higher number of controlled substances prescriptions and at higher quantities than most area physicians.

## E.    Interview of Patient

On March 9, 2017, I received a telephone call from B.H. B.H. identified herself as a current patient of Sanchez's. She said that, on March 1, 2017, she went to a scheduled appointment with Sanchez. During that office visit, B.H. also saw Sanders. B.H. told me that Sanchez informed her that all patients seeing Sanchez were required to also see Sanders. Sanchez told B.H. that this requirement was in accordance with Alabama law.[1] During her appointment with Sanchez, B.H. received a prescription for 100 10-miligram tablets of Norco, a band-name version of acetaminophen and hydrocodone. The prescription was to treat B.H.'s pain.

B.H. reported that she returned to Sanchez's office on March 7. B.H. carried with her to Sanchez's office the remaining pills (approximately 85 of the prescribed 100) she had obtained pursuant to the March 1 prescription. During that visit, she informed Sanchez that the Norco was not effectively reducing her pain. According to B.H., Sanchez then took the pill bottle from B.H. and wrote B.H. a new 10-day prescription tablets of Percocet. Later that day, B.H. went to a pharmacy to fill her new prescription. The pharmacist refused to do so because B.H. had so recently filled the March 1 controlled substances prescription. When B.H. protested that she had returned to Sanchez the Norco pills obtained by way of the March 1 prescription, the pharmacist advised B.H. that she should file a police report.

---

[1] B.H. erroneously stated that the counselor she saw was named "Johnnie Launders."

19

According to B.H., the following day, March 8, B.H. was able to fill the Percocet prescription at a different pharmacy. Nonetheless, concerned about the March 7 incident at the pharmacy, on March 9, B.H. returned to Sanchez's office. She requested that Sanchez return the Norco prescription bottle to her. Sanchez refused to do so. Instead, he showed B.H. the bottle stored in one of his filing cabinets. It appeared to B.H. that the bottle contained fewer than the 85 pills it had contained when B.H. provided the bottle to Sanchez. Sanchez also told B.H. that the "DEA was coming to pick it up." B.H. then left the office.

B.H. also informed me that she had heard that Sanchez's other patients "sell their meds."

After speaking with B.H., I examined DEA records and confirmed that no one contacted the DEA in March of 2017 and requested that a DEA employee retrieve medication from Sanchez's office.

## F.   ABME'S Recovery of Controlled Substances from Sanchez's Office

Soon thereafter, Farley Pugh, the office manager at Sanchez's medical practice, contacted Randy Dixon of the ABME. Pugh stated that Sanchez had, at his office, bottles of medication that he had taken from patients because the patients had not "tolerated" the prescribed medications.

On March 27, 2017, Dixon met with Sanchez at Sanchez's office. Sanchez gave Dixon 13 bottles of controlled substances. Sanchez informed Dixon that he (Sanchez) had been storing these bottles inside a locked file cabinet. Sanchez also claimed to have made notes in the charts of each patient from whom he had confiscated a controlled substance. Sanchez also told Dixon that he (Sanchez) had counted the pills in a bottle before taking that bottle from a patient.

Upon obtaining the 13 bottles, Dixon provided them to his colleague, ABME investigator Edwin Rogers. Rogers noticed that B.H.'s pill bottle was one of the 13. Rogers opened the

bottle bearing B.H.'s name and found only four Norco pills in the bottle.  As noted, B.H. told me

that the bottle contained 85 pills when she gave it to Sanchez.  Rogers also noticed that one of

the other pill bottles contained pills of a type other than the type listed on the bottle's label.

Moreover, another bottle contained nine morphine sulfate pills; however, Sanchez's notes

indicated that the bottle contained 11 pills at the time Sanchez obtained it.

## G.    PDMP Data

Pursuant to our investigation, DEA special agents contacted the ABME to retrieve data

associated with Sanchez and stored in that agency's Prescription Drug Monitoring Program

(PDMP) data.  That database exists to store information about all controlled substances

prescriptions filled or dispensed within Alabama.  Pharmacists who fill prescriptions and

physicians who dispense medications are required to make entries into the PDMP database

whenever they dispense a controlled substance.  The information that must be reported includes:

(1) the patient's name; (2) the prescribing physician; (3) the type and quantities of controlled

substances prescribed; and (4) the name of the dispensing pharmacy or physician.

The PDMP database showed that, in 2015, Sanchez was the 32d highest ranking

prescriber in Alabama for prescribing scheduled controlled substances.  The list included 11,791

doctors.  In 2016, he moved up to 29 on that list, which by then had grown to 11,899 prescribers.

So far in 2017, Sanchez is at number 54 out of 13,150.  This list includes physicians and doctors

of osteopathy who practice palliative care, those who specialize in pain management, and those

who practice in larger markets than Montgomery.

## H.    Signed Prescriptions Mailed to the ABME

Also in 2017, an anonymous person mailed to the office of the ABME an envelope

containing a set of blank prescriptions that appeared to have been already signed by Sanchez.

The ABME took this mailing to indicate that Sanchez was pre-signing prescriptions before actually seeing patients. The ABME notified me of these signed prescriptions.

## I.     Opelika Police Interview of Sanchez's Former Patient

During our review of the PDMP data, we discovered that one of Sanchez's controlled substances patients had an outstanding state warrant issued by the Circuit Court of Lee County, Alabama. Accordingly, in July of 2017, the Opelika Police Department arrested that former patient, M.H.

On July 14, 2017, an Opelika Police detective met with M.H. at the Lee County Sheriff's Department. The detective asked M.H. if he (M.H.) knew anything about "murders, people selling drugs, people selling stolen property, corrupt police officers, corrupt politicians, corrupt doctors, or corrupt nurses." M.H. replied that he knew many drug dealers, and asked the detective to specify about whom the detective wished to receive information.

The detective then asked M.H. if he (M.H.) had ever received treatment from a Montgomery doctor. M.H. replied that, in 2015, he had gone to see Sanchez. M.H. claimed that he had done so because, in 2014, he had been incarcerated in Montgomery with one of Sanchez's patients, F.S. F.S. had told M.H. that M.H. could get pills from Sanchez if M.H. had cash and a legitimate reason. Upon release from custody, M.H. had contacted F.S. (who had also been released) and received instruction from F.S. on how to get pills from Sanchez.

## J.     Surveillance of Sanchez's Office

Additionally, during the spring and summer of 2017, IRS-CI Special Agent Chris Forte conducted routine surveillance of Sanchez's office. Special Agent Forte observed: (1) during the early morning hours, individuals lined up outside of the office apparently waiting for the office to open; and (2) many cars in the office's parking lot throughout the day.

22

**K.      Expert Review of Medical Files**

As noted, Sanchez provided to the ABME files associated with specific patients.  The

ABME then transferred a copy of those files to the DEA.  The ABME also pulled the PDMP

reports associated with those patients and gave those reports to the DEA as well.  Thereafter, I

sent the files to Dr. Gary Kaufman, a licensed specialist in interventional pain management and

neurology practicing in Brunswick, Georgia.  Dr. Kaufman reviewed eight files to determine

whether, as to those seven files, Sanchez had prescribed the controlled substances for legitimate

purposes and within the scope of Sanchez's normal practice.

Dr. Kaufman found flagrantly inappropriate prescribing reflected in six of the eight files.

As for the other two files, Dr. Kaufman had concerns, but acknowledged that those two patients

presented difficult medical issues.  In the obviously bad files, Dr. Kaufman found the following

consistent problems: (1) Sanchez was performing minimal physical examinations; (2) Sanchez's

diagnoses were vague and often consisted of just laundry lists of typical problems that are known

to trigger pain; (3) Sanchez routinely increased dosages or changed medications without

providing an explanation for doing so; (4) Sanchez continued to prescribe controlled substances

despite patients, after submitting urine samples for drug screening, testing positive for illegal

drugs or controlled substances that Sanchez had not prescribed, or negative for the drugs

Sanchez had prescribed; (5) Sanchez issuing prescriptions for controlled substances and then not

document having done so in the patient's medical records; and (6) Sanchez providing early refills

to patients based upon obviously phony excuses provided by patients.

Specific anecdotes reveal the impropriety of Sanchez's practice.  One patient, A.S., went

to the hospital on August 18, 2015.  The hospital admitted her for having "an altered mental

status."  In essence, it appeared that she had overdosed on controlled substances.  Sanchez was

23

aware of this and documented it in A.S.'s chart. Nevertheless, at her next appointment, Sanchez

prescribed A.S. Xanax, Norco, and Percocet. A.S. later died. Contemporaneous police reports

attributed her death to "natural causes." To the best of my knowledge, no one performed an

autopsy. Nevertheless, when informed of A.S.'s death (after he completed the chart review), Dr.

Kaufman stated that he was not surprised that A.S. had died, and he stated that it was most

probable, based upon what he saw in the chart, that she had overdosed on controlled substances

provided by Sanchez.

Another patient received a prescription from Sanchez for codeine cough syrup.

Nevertheless, Sanchez did not document this prescription in the patient's medical records. Nor

did Sanchez even note in the records that the patient had a sore throat.

The charts also reflected sheer carelessness. In one file, Sanchez noted that male patient

Wille Duncan had "no vaginal discharge." Sanchez also purported to have examined Duncan's

female anatomical parts. On a female patient, Sanchez claimed to have performed a detailed

pelvic examination at each of the patient's monthly office visits for over a year. Dr. Kaufman

assured the DEA that no female patient would voluntarily submit to such an invasive procedure

on a monthly basis without a compelling medical justification.

Dr. Kaufman reviewed the chart associated with S.B.—the patient about whom F.B.

contacted the ABME. Dr. Kaufman concluded that the chart did reflect unnecessary prescribing

of controlled substances. However, Dr. Kaufman did not consider S.B.'s chart to constitute as

flagrantly bad care as the care reflected in other charts.

## L.    Interview of Sanchez's Former Employee

On July 18, 2017, I interviewed a former employee of Sanchez's medical practice, Lillian

Akwuba. Akwuba stopped working for Sanchez in 2016. Akwuba informed me, inter alia, that

24

medical files are stored throughout the various buildings located on the property having the address 4143 Atlanta Highway, Montgomery, Alabama 36109.

**M.    CMS Information**

On July 19, 2017, a special agent of the United States Department of Health and Human Services – Office of Inspector General reviewed data associated with Medicare and Medicaid reimbursement for services performed by Sanchez and medications prescribed by Sanchez. The special agent determined that, over the past five years, Medicaid has paid approximately $1.5 million each year for controlled substances prescribed by Sanchez. Based upon the foregoing, it is probable that some of those payments were for illegitimate prescriptions.

**N.    Information about Vehicle**

On August 1, 2017, I and other agents executed a search warrant at Sanchez's office, located at 4143 Atlanta Highway. During the resulting search, I observed a white Tesla sedan parked in a parking place reserved for Sanchez. Moreover, another agent has previously seen Sanchez driving that vehicle. I looked inside the window of the parked vehicle. I observed what appeared to be an iPad tablet computer placed in the front passenger seat of the vehicle. I know based upon previous information received in this case that there are likely medical records stored on that iPad computer. The vehicle did not have any license plates and, thus, I could not check state records to confirm that the vehicle belongs to Sanchez.

**III. PROCEDURES FOR SEARCHES OF ELECTRONIC DEVICES**

As described above and in Attachment B, this application seeks permission to search and seize records that might be found on the premises, in whatever form they are found, including but not limited to medical records for Sanchez's patients. One location where the records might be found is stored on a computer's hard drive or other storage media or smartphone, as described

25

in Attachment B. Some of these electronic records might take the form of files, documents, and other data that is user-generated. Some of these electronic records, as explained below, might take a form that becomes meaningful only upon forensic analysis.

Also, based on my training, experience, and information provided by other law enforcement officers, I know that many smartphones (which are included in the definition of "computer equipment" in Attachments B-1 and B-2) can now function essentially as small computers. Smartphones have capabilities that include serving as wireless telephone, digital camera, portable media player, GPS navigation device, sending and receiving text messages and e-mails, and storing a vast range and amount of electronic data. Examining data stored on devices of this type can uncover, among other things, evidence that reveals or suggests who possessed or used the device. I also know that if an individual is not carrying a smartphone on his person, it is likely stored in his place of residence, or where he may be residing, or stored

I submit that if a computer or storage medium is found on the premises, there is probable cause to believe the records described in Attachment A will be stored on that computer or storage medium, for at least the following reasons:

>  a. Based on my knowledge, training, and experience, I know that computer files or remnants of such files can be recovered months or even years after they have been downloaded onto a storage medium, deleted, or viewed via the Internet. Electronic files downloaded to a storage medium can be stored for years at little or no cost. Even when files have been deleted, they can be recovered months or years later using forensic tools. This is so because when a person "deletes" a file on a computer, the data contained in the file does not actually disappear; rather, that data remains on the storage medium until it is overwritten by new data.

b.  Therefore, deleted files, or remnants of deleted files, may reside in free space or slack space—that is, in space on the storage medium that is not currently being used by an active file—for long periods of time before they are overwritten.  In addition, a computer's operating system may also keep a record of deleted data in a "swap" or "recovery" file.

c.  Wholly apart from user-generated files, computer storage media—in particular, computers' internal hard drives—contain electronic evidence of how a computer has been used, what it has been used for, and who has used it.  This evidence can take the form of operating system configurations, artifacts from operating system or application operation, file system data structures, and virtual memory "swap" or paging files.  Computer users typically do not erase or delete this evidence, because special software is typically required for that task.  However, it is technically possible to delete this information.

d.  Similarly, files that have been viewed via the Internet are sometimes automatically downloaded into a temporary Internet directory or "cache."  The browser often maintains a fixed amount of hard drive space devoted to these files, and the files are only overwritten as they are replaced with more recently viewed Internet pages or if a user takes steps to delete them.

e.  Based on my training and experience investigating physicians, in almost every medical practice some manner of computer system is utilized, whether to manage patient medical records, save prescription histories, or handle patient billing needs, and thus there is reason to believe that there is a computer system currently

located on the premises, and that the computer system is storing evidence related to the offenses under investigation.

This application seeks permission to locate not only computer files that might serve as direct evidence of the crimes described on the warrant, but also for evidence that establishes how computers were used, the purpose of their use, who used them, and when.

Although some of the records called for by this warrant might be found in the form of user-generated documents (such as word processor, picture, and movie files), computer storage media can contain other forms of electronic evidence as well:

     a.  Forensic evidence of how computers were used, the purpose of their use, who used them, and when, is called for by this warrant. Data on the storage medium not currently associated with any file can provide evidence of a file that was once on the storage medium but has since been deleted or edited, or of a deleted portion of a file (such as a paragraph that has been deleted from a word processing file). Virtual memory paging systems can leave traces of information on the storage medium that show what tasks and processes were recently active. Web browsers, e-mail programs, and chat programs store configuration information on the storage medium that can reveal information such as online nicknames and passwords. Operating systems can record additional information, such as the attachment of peripherals, the attachment of USB flash storage devices or other external storage media, and the times the computer was in use. Computer file systems can record information about the dates files were created and the sequence in which they were created.

b. Forensic evidence on a computer or storage medium can also indicate who has used or controlled the computer or storage medium. This "user attribution" evidence is analogous to the search for "indicia of occupancy" while executing a search warrant at a residence. For example, registry information, configuration files, user profiles, e-mail, e-mail address books, "chat," instant messaging logs, photographs, and correspondence (and the data associated with the foregoing, such as file creation and last accessed dates) may be evidence of who used or controlled the computer or storage medium at a relevant time.

c. A person with appropriate familiarity with how a computer works can, after examining this forensic evidence in its proper context, draw conclusions about how computers were used, the purpose of their use, who used them, and when.

d. The process of identifying the exact files, blocks, registry entries, logs, or other forms of forensic evidence on a storage medium that are necessary to draw an accurate conclusion is a dynamic process. While it is possible to specify in advance with particularity a description of the records to be sought, evidence of this type often is not always data that can be merely reviewed by a review team and passed along to investigators. Whether data stored on a computer is evidence may depend on other information stored on the computer and the application of knowledge about how a computer behaves. Therefore, contextual information necessary to understand the evidence described in Attachment B also falls within the scope of the warrant.

e. Further, in finding evidence of how a computer was used, the purpose of its use, who used it, and when, sometimes it is necessary to establish that a particular

29

thing is not present on a storage medium. For example, I know from training and
experience that it is possible that malicious software can be installed on a
computer, often without the computer user's knowledge, that can allow the
computer to be used by others, sometimes without the knowledge of the computer
owner. Also, the presence or absence of counter-forensic programs (and
associated data) that are designed to eliminate data may be relevant to establishing
the user's intent. To investigate the crimes described in this warrant, it might be
necessary to investigate whether any such malicious software is present, and, if
so, whether the presence of that malicious software might explain the presence of
other things found on the storage medium. I mention the possible existence of
malicious software as a theoretical possibility, only; I will not know, until a
forensic analysis is conducted, whether malicious software is present in this case.

Searching storage media for the evidence described in Attachment B may require a range
of data analysis techniques. It is possible that the storage media located on the premises will
contain files and information that are not called for by the warrant. In rare cases, when
circumstances permit, it is possible to conduct carefully targeted searches that can locate
evidence without requiring a time-consuming manual search through unrelated materials that
may be commingled with criminal evidence. For example, it is possible, though rare, for a
storage medium to be organized in a way where the location of all things called for by the
warrant are immediately apparent. In most cases, however, such techniques may not yield the
evidence described in the warrant. For example, information regarding user attribution or
Internet use is located in various operating system log files that are not easily located or
reviewed. As explained above, because the warrant calls for records of how a computer has been

used, what it has been used for, and who has used it, it is exceedingly likely that it will be necessary to thoroughly search storage media to obtain evidence, including evidence that is not neatly organized into files or documents. Just as a search of a premises for physical objects requires searching the entire premises for those objects that are described by a warrant, a search of this premises for the things described in this warrant will likely require a search among the data stored in storage media for the things (including electronic data) called for by this warrant. Additionally, it is possible that files have been deleted or edited, but that remnants of older versions are in unallocated space or slack space. This, too, makes it exceedingly likely that in this case it will be necessary to use more thorough techniques.

Based upon my knowledge, training and experience, I know that a thorough search for information stored in storage media often requires agents to seize most or all storage media to be searched later in a controlled environment. This is often necessary to ensure the accuracy and completeness of data recorded on the storage media, and to prevent the loss of the data either from accidental or intentional destruction. Additionally, to properly examine the storage media in a controlled environment, it is often necessary that some computer equipment, peripherals, instructions, and software be seized and examined in the controlled environment. This is true because of the following:

        a. The nature of evidence. As noted above, not all evidence takes the form of documents and files that can be easily viewed on site. Analyzing evidence of how a computer has been used, what it has been used for, and who has used it requires considerable time, and taking that much time on premises could be unreasonable.

        b. The volume of evidence. Storage media can store the equivalent of millions of pages of information. Additionally, a suspect may try to conceal criminal

evidence; he or she might store it in random order with deceptive file names. This may require searching authorities to peruse all the stored data to determine which particular files are evidence or instrumentalities of crime. This sorting process can take weeks or months, depending on the volume of data stored, and it would be impractical and invasive to attempt this kind of data search on-site.

c. Technical requirements. Computers can be configured in several different ways, featuring a variety of different operating systems, application software, and configurations. Therefore, searching them sometimes requires tools or knowledge that might not be present on the search site. The vast array of computer hardware and software available makes it difficult to know before a search what tools or knowledge will be required to analyze the system and its data on-site. However, taking the storage media off-site and reviewing it in a controlled environment will allow its examination with the proper tools and knowledge.

d. Variety of forms of electronic media. Records sought under this warrant could be stored in a variety of storage media formats that may require off-site reviewing with specialized forensic tools.

In light of these concerns, I hereby request the Court's permission to seize the computer hardware, storage media, and associated peripherals that are believed to contain some or all of the evidence described in this warrant, and to conduct an off-site search of the hardware for the evidence described, if, upon arriving at the scene, the agents executing the search conclude that it would be impractical to search the hardware, media, or peripherals on-site for this evidence. If computers or other digital devices are found in a running state, I am requesting that the agents be authorized to acquire evidence from the devices prior to shutting the devices off. In addition, in

32

the execution of this warrant, the agents may seize all computers and computer-related media to be searched later by a qualified examiner in a laboratory or other controlled environment.

I recognize that not all of Sanchez's prescriptions were illegitimate and that he is likely to have many legitimate pain management and other patients. I also recognize that Sanchez's clinic is a functioning medical business with employees and patients, and that a seizure of the clinic's computers may have the unintended effect of limiting Sanchez's and his partners' abilities to provide service to legitimate patients. In response to these concerns, the agents who execute the search anticipate taking an incremental approach to minimize the inconvenience to Sanchez and his partners and his legitimate patients and to minimize the need to seize equipment and data. It is anticipated that, barring unexpected circumstances, this incremental approach will proceed as follows:

      a. Upon arriving at the premises, the agents will attempt to identify a system administrator of the network (or other knowledgeable employee) who will be willing to assist law enforcement by identifying and copying paper and electronic copies of the things described in the warrant. The assistance of such an employee might allow agents to place less of a burden on the clinic than would otherwise be necessary. Copying or imaging of all patent medical files will nevertheless be necessary, as I know from my investigations of other doctors involved in criminal activity and medical violations that patient files can contain evidence that is only identifiable by a medical expert and often individual actions are best understood in the context of all patients treated by a particular physician.

      b. If the employees choose not to assist the agents, the agents decide that none are trustworthy, or for some other reason the agents cannot execute the warrant

successfully without themselves examining the clinic's computers, the agents will attempt to locate the things described in the warrant, and will attempt to make electronic copies of those things. This analysis will focus on things that may contain the evidence and information of the violations under investigation. In doing this, the agents might be able to copy only those things that are evidence of the offenses described herein, and provide only those things to the case agent. Circumstances might also require the agents to attempt to create an electronic "image" of those parts of the computer that are likely to store the things described in the warrant. Generally speaking, imaging is the taking of a complete electronic picture of the computer's data, including all hidden sectors and deleted files. Imaging a computer permits the agents to obtain an exact copy of the computer's stored data without actually seizing the computer hardware. The agents or qualified computer experts will then conduct an off-site search for the things described in the warrant from the "mirror image" copy at a later date. If the agents successfully image the clinic's computers, the agents will not conduct any additional search or seizure of the clinic's computers while on site.

c. If imaging proves impractical, or even impossible for technical reasons, then the agents will seize those components of the company's computer system that the agents believe must be seized to permit the agents to locate the things described in the warrant at an off-site location. The seized components will be removed from the premises. If employees of the clinic so request, the agents will, to the extent practicable, attempt to provide the employees with copies of data that may be necessary or important to the continuing function of the clinic's legitimate

business. If, after inspecting the computers, it is determined that some or all of this equipment is no longer necessary to retrieve and preserve the evidence, the government will return it within a reasonable time.

d. Specifically with respect to patient medical records stored on the premises, in whatever form, I am requesting that the copying and imaging of these files be conducted offsite because of the anticipated volume of medical records based on my training and experience with similar investigations. I am specifically requesting that all patient files be seized in order to have all or selected medical records reviewed by an expert in whichever medical field is considered approximate for the listed medical diagnosis. However, the agents executing the search warrant will attempt to determine the patient schedule and prioritize the copying or imaging of the medical files for the patients with the first scheduled visits so as to minimize any disruption to the legitimate medical services Sanchez or his partners provide.

## IV. REQUEST FOR SEALING

It is respectfully requested that this Court issue an order sealing, until further order of the Court, all papers submitted in support of this application, including the application and search warrant affidavit. I believe that sealing these documents is necessary because the items and information to be seized are relevant to an ongoing investigation and not all of the targets of this investigation will be searched at this time. Based upon my training and experience, I have learned that online criminals actively search for criminal affidavits and search warrants via the internet, and disseminate them to other criminals as they deem appropriate. Premature disclosure of the contents of this affidavit and related documents may have a significant and negative impact on the

35

continuing investigation and may severely jeopardize its effectiveness.  In addition, this affidavit includes personal identifying information and/or protected medical information for certain patients of Sanchez, and thus restricted access is desirable to protect confidentiality.

## V. CONCLUSION

Based upon the foregoing and upon my training and experience, I submit that there is probable cause to believe that the premises described as the medical offices of Dr. Gilberto Sanchez, M.D., also the offices of Gilberto Sanchez M.D., Inc., located at 4143 Atlanta Highway, Montgomery, Alabama 36109, all buildings, structures, storage facilities, and other artifices located at that address, contains fruits, instrumentalities, and evidence related to possible violations of Title 21, United States Code, Section 841(a)(1), to wit, prescribing controlled substances outside the course of professional practice and without a legitimate medical purpose.

I swear under penalty of perjury that the foregoing is true and correct.

Darryl W. Henton
Special Agent, Drug Enforcement Administration

Sworn to before me this
1st day of August, 2017.

GRAY M. BORDEN
UNITED STATES MAGISTRATE JUDGE
MIDDLE DISTRICT OF ALABAMA

36